We'll hear the next case on the list, and that's U.S. ex-rel Kaczynski v. Carlisle HMA. Carlisle HMA Good morning, Your Honors. My name is Mark Simpson, and I represent Ted Kaczynski, the plaintiff and appellant in this false claims act case. I'd like to reserve five minutes of my time. The facts of this case are set forth in the briefs, and if Your Honors want, I can go into them in some detail, but as Your Honors are aware, this case involves a financial relationship between Carlisle HMA, a hospital in Carlisle, Pennsylvania, and Blue Mountain Anesthesia Associates, or BMAA, which is an anesthesiology and pain management practice. And in particular, this case involves Blue Mountain's operation of a pain clinic, which is a stand-alone facility located, it was located about three miles away from the hospital facility where they saw patients for pain management office visits. And the only real issue on appeal here is whether that relationship, whether the arrangement between the parties satisfied the personal services contract exception under the Stark statute and the anti-kickback statute, which are substantially identical exceptions. The trial court held as a matter of law that... Yes, Your Honor, and I guess that's why I said that's the only real issue I was planning to address. Okay, tell me why that's not a real issue because it disturbed me. That discussion, Your Honor, I think just fundamentally misunderstands what a referral is. The Stark statute specifically defines referral to include a request by a physician for the performance of a test or anything, and there's no reason to believe that the anti-kickback statute has any separate definition of referral. A hospital doesn't make a referral, a physician makes a referral. In particular, in this case, the physician, the patients were coming not to the hospital. They were not hospital patients. That's merely a matter of semantics. They were coming to see the Blue Mountain pain management physicians because they had an office-based pain management practice. How do we know that? There's testimony in the record from Dr. Kaczynski to that effect that I've cited in my brief. These are patients who are not receiving surgery at the hospital. In fact, the Blue Mountain physician that's assigned to the pain management clinic at any given time, during that time, he has no anesthesia duties. He is not providing anesthesia services for any hospital patients. You might say they're hospital patients, but that's merely a matter of semantics. It really has nothing to do with the question of whether, when a patient comes to see the physician for an office visit, and then the doctor orders an x-ray or some other procedure, that is clearly a referral under the Stark statute and under the anti-kickback statute. When defendants discussed this issue in their brief, they tried to rely upon a regulation the trial court relied upon, which really has nothing to do with referrals. That regulation has simply to do with whether or under what circumstances an off-site facility can be considered part of the hospital. The Stark statute and the anti-kickback statute, by contrast, deal expressly with the issue of the legality of referrals. And I would point out that even physicians who are employed by the hospital and work at the hospital's main hospital, they have to comply with the Stark statute and the anti-kickback statute. There are exceptions under the Stark and anti-kickback statute that deal with, you know, bona fide employees. And a fortiori, if an employee at the main hospital building can make a referral, a contract doctor who is at an off-site facility can also make a referral. What's the policy behind these statutes? They are similar, but subtly different. The Stark statute, the policy underlying the Stark statute is that Congress noticed and found that when physicians have financial relationships with entities, they refer claims payable under Medicare far more often, which results in over-utilization of Medicare services, results in greater expenditure of funds for Medicare. And so Congress decided to address this situation by establishing a, you know, a prohibition against submitting claims where a physician has a financial relationship unless the physician, unless the arrangement comes within the strict terms of an exception. And so that is the policy behind the Stark statute. And, you know, the Stark statute does not require a case-by-case analysis of any particular arrangements, except to the extent of determining whether a financial relationship exists and whether there is an applicable exception. What bothers me is that Mr. Kuczynski submitted this ketamine action to Medicare, to the government, and the government then had the possibility of taking over the case and bringing the action. And it didn't do that, from which one might conclude that the government didn't think there was anything wrong with what happened here. Is that an incorrect conclusion? I believe, Your Honor, it is both an incorrect conclusion and an irrelevant conclusion. The False Claims Act, which is a congressional enacted statute, expressly provides that a relator may continue with an action after the United States declines to intervene. And the government can decline to intervene for any number of cases, for any number of reasons. Many of the times it declines to intervene because of resource issues. But it paid all the claims. I mean, we've seen lots of cases where Medicare doesn't pay certain claims because it feels that they are inappropriate. And Medicare, in general, does not have facts that would show it the nature of a relationship, whether a physician has a financial relationship. And I would say, in particular in this court, I mean, sorry, in particular in this case, I don't know what the government did or did not do when they intervened. But there is a pile of evidence that came out during discovery in this case that was, I believe, clearly not given to the government, including numerous internal documents by the defendant talking about the fact that we don't have an agreement with Blue Mountain dealing with their activities in the pain clinic. The government did not have the documents where the former chief compliance officer for HMA specifically advised his superiors that we have a stark and anti-kickback violation. Well, you're not really addressing the primary issue in this case, right? Not yet, Your Honor. Whether or not there was an agreement. Your Honor, and I would say. Isn't that what you're really addressing now? Yes, Your Honor. And there are several requirements that you have to be met, one of which is that the agreement has to set forth the compensation that is being paid to the physicians and it has to identify the services the physicians are provided. And the reason for that is simple, to make the relationship transparent. In this case, the compensation at issue in this case consists primarily of the free office space provided to the physicians at the pain clinic. Office space, free staff, free equipment that they could use to establish an office-based pain management practice, a lucrative line of business that they could not do before because they didn't have dedicated staff, dedicated office space. Let me ask you the question that Judge Stapleton asked in the prior case, and that is the district court held that the fact that, well, held that there was fair market value in effect, right? I mean that. The district court held that by definition there was fair market value, Your Honor. Okay. By what standard do we review that finding? Your review of that finding, like every other finding in this case, is de novo, Your Honor, with no deference given to the trial court. And as to that particular finding, that is the definition of fair market value in the Stark statute expressly says that, you know, it reflects the price that we've paid by people who are not in a position to refer to each other or to generate business for the other party. Well, why do we use the de novo standard? Isn't that a factual finding which would have to be clear error? No, Your Honor. This is a grant of summary judgment to the defendant supposedly taking in all the evidence in the light most favorable to us. One of the defendant had the burden of establishing fair market value, and the defendant put up no evidence on that. And the trial court just looked at the agreement and said they negotiated it. It must be fair market value. And as I have set forth extensively in our briefs, you know, that is exactly the opposite of the way it's supposed to be. Because the fair market value definition requires that it be the price that would be paid by people who are not in a position to generate referrals. And if these physicians were not in a position to generate referrals to the hospital, there's no way the hospital would provide them with free office space and free staff and free equipment. I see that my light has expired. Do you have any questions? I'm content for present. Okay. Thank you. We'll catch you on rebuttal. Thank you. Good morning. May it please the Court. My name is Larry Selkowitz, and I have with me Mr. Timothy R. Perry, who is the Senior Vice President and General Counsel for Health Management Associates, who are the owners and operators of the Carlisle Hospital. The very short argument is Judge Conner got it right. Thank you. And do you have any questions? You really want to do that? Well, I do want to answer your questions. All right. Well, let's start where we just left off here. And he was saying that you came forward with no evidence. The other side moved for summary judgment. You came forward with no evidence to indicate that the consideration that was received for these services did not exceed the fair market value. And the district court said, well, we know that it's fair market value because it was negotiated. But when this 1992 contract was negotiated, this office space, this staff, this everything they were getting for free didn't even exist. And at some point I want to get back to the faulty premise that underlies everything. Answer his question. It's related to this. Okay. If the premise, if the correct premise is applied, the correct premise is this. A hospital builds all kinds of facilities, oncology, emergency departments, interventional radiology, the theory that if they build them, doctors in the community will refer their patients to them. The remuneration in this case that we have to say is this fair market value has nothing to do with the bricks and mortars. They did not give Blue Mountain a really nifty clinic with beds and staff and drugs and needles for Blue Mountain's patients. Blue Mountain had no patients, has never had any patients. What we had was a hospital that had everything. These doctors don't build these folks, huh? No. Blue Mountain gets its patients by referrals from community doctors who refer to the hospital's pain center. At any moment in time, a community doctor would not even know which physician was in the pain center because the contract was Blue Mountain, you assign people to the pain center. Blue Mountain, in fact, helped evolve the pain center. But just like an emergency department, hospitals have to compete. So they build a really good emergency department. They employ the doctors or they have one exclusive contract. What's the remuneration? What's the compensation? What's the consideration in simple contract terms? What Dr. Alster testified to, and he's the guy who negotiated the contract, what Mr. Ziesmer, who was the CFO, testified as well, the remuneration, the compensation, the consideration is the exclusive right to bill third-party payers like Medicare for the professional component only. The contract says you will provide services using hospital materials for hospital patients only. Negative inference being you are not bringing any private patients that you might acquire in here. You can't do that. So the only patients that are seen in the pain clinic or the inpatient oncology or the interventional radiology are already hospital patients. Now how do we know this? This entire process is regulated by the second most complicated Medicare payment system known, called the outpatient prospective payment system, which then forms ambulatory payment classification groupings, blah, blah, blah, and they come up with a fee, and they say to everybody in a geographic area, if you bill us one of these, here's what you're getting paid for the facility component. The record is clear. The hospital bills the facility component. The value of that, and now I get to the fair market value question, and what is in the record, that the fair market value of that is what Medicare says it is. It wouldn't matter if they billed a diamond studded pain clinic. They're going to get the ambulatory payment classification of the outpatient prospective payment system for a provider-based facility. They're going to get 12 bucks for the facility, and they bill it to Part B. Doctor, you only get the professional fee portion. You bill that to Part A, and that's preset under that very same complicated, horrendously difficult to follow system. So the remuneration that the doctors got, the value, the fair market value, the remuneration the doctors got was whatever the third party payor, in this case Medicare, was willing to pay, and it's a set fee. It doesn't vary with the volume or amount of referrals. It doesn't matter whether the clinic in which his patient is coming. Well, help me with that because I can't get my arms around that. It would seem to me that the purpose of the statute is a concern about excessive incentive to doctors to make referrals to somebody that they have a And so it would seem to me that in order to find out whether there's excessive incentive or excessive compensation, you would have to look to the value of what the doctors receive. Correct. And free rent. They don't get free rent. Free rent is a, they don't get free rent? Absolutely not. And the reason for this is they're just the hired professional staff. If we could have hired them as employees, would you have suggested, and I don't think you would have, that they got free rent to be in that space? Of course not. The only difference is they're on an independent contractor because they want the benefit of the tax write-offs for their expenses for their personal cars and so on and so forth. But they're not their patients. So the incentive question doesn't exist here. They're not referring any patients to this facility. The hospital is getting referrals from all the community doctors. The Blue Mountain people are the doctor that's in that facility. Does the record show that? Yes. Does the record show that the community doctors refer to the pain clinic as opposed to Dr. Brown because Dr. Brown is known to be the best guy in the pain management field? The plaintiff's complaint in paragraph 50 says, it starts right there, that community-based physicians refer patients to the pain clinic. And they couldn't refer them to a given doctor. You can't use a complaint for some reason. I understand. But that's only where it starts. Dr. Alster testified to it. Dr. Kozinski testified to it. They get their patients referred to the pain clinic. I'll give you a very clear example that would show why we would be wrong if we did it. Dr. Kozinski quit and he went across the street. To compete. To compete. If we had said to Dr. Kozinski, look, you're going to have doctors in the community referring patients over to you, I'll tell you what, we'll staff you with nurses if you promise that everything you need to get for those people you'll get from us. That's a stark violation. Because they have their own patients. And so the decision to refer, they're going to get in-kind compensation that's going to skew their judgment as to what tests they should send their people over to the hospital for because they're getting the kicker. That doesn't happen in an inpatient, excuse me, outpatient facility that's what's called provider-based. And in fact, the provider-based regulations, unlike what Mr. Simpson likes to assert, obligate the doctors in any of these outpatient facilities to make sure that those patients get their, quote, referrals from the hospital itself as long as it's not met at the improper. And that's part of it. If you want to qualify for the system, this is how it works. Your outpatient facility has to be fully integrated with the inpatient, financially, directorially, everything else, and therefore those are hospital patients. And that's the only reason the hospital gets to have a piece of it. If that same thing was done in a doctor's office, Dr. Kozinski across the street, he would get the facility piece and the physician piece. In this situation, the employee, in this case the independent contractor rather, gets to bill and the only money he gets, he gets nothing else for doing this, he provides a professional service in our suite with our patients guaranteed by OPPS or we wouldn't get paid for them, and all he gets is the Medicare payment, and Medicare is the fair market value. And that's all over the record. We're going to run out of time here. What do you say, they say, well, even assuming you're right on that, there's a premium on transparency here, and in order to qualify for the exception or exemption, you have to have a written contract which specifies the compensation and the services. Now, here, the only contract that is in the record, as I understand it, is a 1992 contract, which, and the pain clinic was not even in existence then, and the contract itself has a provision that anticipates that the hospital may develop new facilities like the pain clinic, and in that event, we'll negotiate a new contract, and there never was a new contract negotiated. Now, what do you say to that? Because the contract itself turned out to have been sufficient to cover the slow accretion of more specific pain management care, led by Dr. Kaczynski and Blue Mountain. They all felt at the time that because it covers, it obligates Blue Mountain to provide enough doctors to do all anesthesiology and pain management, there was no need to change the contract. Wait a minute. Wait a minute. The contract talks about services to be provided and facilities to be provided at a specific location, at the hospital, and the hospital is at a specific address, and it's not the address of the pain clinic because the pain clinic didn't exist. And the best I can tell you is that the parties ratified it by continuing to perform. Remember, this is a contract formed five years, almost six years, before Starkregs existed. So it wasn't done by the fine-penciled lawyers parroting the language. So we have what we have. It said you're going to provide all of this. So there was a tacit agreement between Blue Mountain and the hospital. Absolutely. Does that satisfy the transparency requirement of the statute? A tacit agreement? I don't think that there is a tacit agreement that this contract, in fact, on its face, provides all of the terms that we need has anything to do with whether it does or doesn't satisfy Stark, frankly. It's a writing, as the judge found, Judge Connor, satisfies every provision. Fair market value was the right to bill to the third party payor. That's a fair market value because Medicare is set in the market. And as Judge Connor wrote, this is the paradigm of fitting into this exception. And he's absolutely right. You're saying the district court determined that this contract, the written contract, satisfied the Stark Act? Yes. Right now, what kind of review is that subject to? Plenary review? I think it is. I think that's the conclusions of law that we have in summary judgment. Legal interpretation, right? Yes. All right. Now, what do we do with all, you know, just sort of in the passing way of Mr. Simpson pointing to, you know, all this evidence in the record that even the people at Carlisle recognized that there was a need for a written contract to cover the pain clinic, right? They, you know, several communications like that. They erroneously concluded. Oh, you say there were an error? The original, the original people who looked at it got concerned because if you look at the cases in the papers and they're trying very hard to make sure everything complies, the first two people who looked at it and then put it aside, talked with Blue Mountain, put it aside, were wrong. They thought at the time that we, the hospital was not charging the hospital piece and giving that to the doctors. That would have been a problem. In fact, it's what the inspector general has said about these exclusive contracts. They say, you know, the problem is not what the doctors are getting from the hospitals. It's what the hospitals are demanding from doctors for these exclusive contracts. And they list them and it's attachment B to my brief. Or A, things like doctors, you have to give us a $600,000 a year fee. Doctors, you have to give us 10%. That's a kickback. And that's, that's an unfair relationship. That's not market value. That would have been a problem. We don't have that. We have a very simple thing. The light is on unless the court has a question. I'm done. I'm content again. Thank you. Thank you much. We'll hear the rebuttal. Your Honor, with all due respect, pretty much everything Mr. Sulkowicz talked about was, is either incorrect or irrelevant. As to the issue of how patients arrive at the pain clinic, as I said before, that's really an irrelevant issue. Regardless of how they arrive there, once they get there, the physicians are the ones who make referrals for designated, for items of designated health services. So really how they arrive there is irrelevant. The record evidence, however, shows that they arrive there because that's where the physicians are. I mean, if the hospital did not have Blue Mountains physicians running a pain clinic, nobody would be coming there for office-based pain management visits. And Dr. Kuczynski testified to that effect. I believe Mr. Sulkowicz stated that whether this contract has all the terms we need has nothing to do with Stark. Well, it's really exactly the opposite. The Stark statute sets forth very specific conditions for when something can comply with the personal services contract exception. And among those are that you have to have a written contract that specifies the services and identifies the remuneration. This contract, the 1992 contract, simply doesn't. You suggest in your brief that it doesn't even cover pain management, but clearly it does. I mean, those words are in there. What I say in my brief, Your Honor, is that the words pain management appear. However, the agreement imposes no affirmative obligations upon Blue Mountains to provide any pain management. And in fact, while ruling against us, the district judge agreed with that. The district judge expressly held that the contract imposes no affirmative obligations to perform pain management. But regardless of whether it uses the words pain management, the question is, does it identify the services that are provided at the pain clinic? And clearly it does not, because those services were not even contemplated at the time. And I would toss out as a thought experiment, you know, what if the hospital came to Blue Mountain in 1998 and said, we want you to assign somebody full-time to staff an office-based pain clinic where you're not going to be doing anesthesia, you're going to be seeing patients and, you know, you only have four physicians and one of those is going to be unavailable to cover your anesthesia duties and you have to assign him to the pain clinic. Blue Mountain easily could have said no, because there's nothing in the agreement. And, you know, if it could have said no, then it's not covered by the agreement. And conversely, the agreement, in order to satisfy the exception, has to identify the compensation paid. Well, let's suppose in 1998, Blue Mountain had said to the hospital, we want you to provide us with office-based treatment rooms that are dedicated to us. I want you to assign full-time nursing staff to do nothing but assist us in seeing office-based pain management patients. We're not going to be doing anesthesia while we're doing this, and we want you to fully stock it with equipment for us. Well, the hospital could have said no, because that's not set forth in the agreement. And so, and if it's not set forth in the agreement, then the exception does not apply. And to add one even more, one fact that even more concretely proves that, as your Honor, Judge Stapleton noted, the agreement talks about providing services at the hospital, which was the hospital building three miles away. There is, in fact, a provision that talks about, you know, what happens if we want to provide something at another facility, and it indicates that the parties would enter into a new contract. And they didn't. But even if they had entered into a new contract, it would have had to look vastly different from the contract that existed in 1992, because that contract, you know, that contract set forth the relationship as it existed in 1992. And at that time, it was a run-of-the-mill anesthesia services agreement. And as I state in our briefs, you know, HHS has noted that in traditional hospital-based services like anesthesia, it's really the hospital that's in a position to generate business for the patient. Somebody needs a surgery, surgery's scheduled, the hospital says, who are we going to get to cover the anesthesia? An office-based pain management practice, by contrast, is the exact opposite. It's the physicians who are generating services for the hospital. So it's not only that there are a few details that changed, but the fundamental nature of the relationship changed in 1998 when the pain clinic opened. And it changed with respect to the issue that is at the heart of the Stark and which party is in a position to generate referrals for the other. And clearly, clearly, I mean, you know, the district court, to the extent that I refer to this as some sort of a paradigm, this is the farthest thing from a paradigm of compliance with the personal services contract exception that I can imagine. This is, in fact, the paradigm for how not to comply with the arrangement. Assuming we thought you were right and decided to reverse, what should we tell, what should our instructions to the district court be?  I think, Your Honor, that the instructions to the district court are, you know, the district court held that at least as a Stark, it held that there were Stark referrals. And there's simply no dispute about that. Its decision was wrong with respect to the anti-kickback statute. I think the only issue remaining is the issue of knowledge. And the trial court didn't reach that in its summary judgment. I think the evidence of knowledge is sufficient. Knowledge by whom, of what? Of what, yes. We're dealing here with False Claims Act liability. The violation of Stark and anti-kickback statutes is what makes a claim false. And you're liable under the False Claims Act if you knowingly submit false claims. So in order to be liable under the False Claims Act, there's an additional element that you have to have acted knowingly, which includes deliberate ignorance or reckless disregard. And I think the evidence justifies summary judgment for us on that issue, given all of the facts. But the district court has not passed that law, so you're not entitled to partial summary judgment on liability yet, you say. But we moved on that, and the judge, because they granted their motion, denied ours as moot. So that would be an issue on remand. Okay. If anything, wouldn't the district court have to decide the fair market value, the value of that which they're getting? Your Honor, that issue is one element of the personal services exception, which is even the district court recognizes the defendant's burden to establish. Yeah. But that's why if the district court erred in granting summary judgment, then isn't the question on sending it back that the district court has to get, take some evidence or get some evidence of the requirements under the personal services exception? I don't think so, Your Honor. The evidence is there. The evidence is there. The question is whether defendants have satisfied the exception, and as we've pointed out, there are many other elements. Where is the evidence? You say the evidence is there. Can you tell us? Tell us on the appendix, where is the evidence of the value of a facility? I mean, assuming that you are right and that it's not all one, that they're not hospital patients. I agree. There's not evidence of the fair market value. However, the failure to satisfy the other elements of the exception, including that the agreement, you know, the other elements can be decided by reference to looking at the agreement, and if they don't satisfy those elements, then they don't satisfy the exception regardless of the fair market value. You don't even have to get to the fair market value because they haven't satisfied the other elements, and therefore there's a financial relationship. Thank you. Thank you. Thank you.